**ABRASIVES–SOUTH, INC., Plaintiff,**

**v.**

**AWUKO ABRASIVES WANDMACHER GMBH & CO. KG, Wandmacher GmbH, and Marty Korte, Defendants.**

**No: 2:16–cv–768–RMG**

United States District Court,
D. South Carolina.

Signed October 4, 2016

John Hughes Cooper, John Townsend Cooper, John Hughes Cooper Law Office, Mt. Pleasant, SC, John B. Kern, John B. Kern International Law, Charleston, SC, for Plaintiff.

Neil S. Haldrup, Elmore and Wall, Morgan S. Templeton, Charleston, SC, for Defendants.

## ORDER

Richard M. Gergel, United States District Court Judge

This matter is before the Court on Plaintiff's Rule 59(e) motion to alter or amend the Order granting Defendants Awuko and Wandmacher's motion to dismiss for running of the statute of limitations. (Dkt. No. 24). For the reasons below, the Court **DENIES** the motion.

### Background

Plaintiff ASI is a North Charleston, South Carolina-based manufacturer, processer, and distributor of abrasive products (*e.g.*, sandpaper). Defendant AWUKO is a Germany-based abrasive products manufacturer. In 2008, Plaintiff began purchasing products from Defendant AWUKO, and in April 2011, Plaintiff and Defendant AWUKO entered into two agreements.

Marty Korte worked for Plaintiff as its national sales manager. In March 2012, Korte left Plaintiff's employ. At that time, Plaintiff's president confronted Korte regarding suspicions that Korte "had been providing information to other competitors and vendors." (Dkt. No. 15–1 at 1–2). Korte denied any wrongdoing.

The business relationship between Plaintiff and Defendant AWUKO deteriorated, and Carter confronted Defendant

AWUKO's president at least twice before November 2012 regarding suspicions that AWUKO had improperly paid Korte. On October 29, 2012, Defendant AWUKO filed for declaratory negative relief in Gottingen District Court in Germany. On February 1, 2016, Plaintiff filed suit against Defendants in the Charleston County Court of Common Pleas (Dkt. No. 1–1), and this action was removed to this Court on March 10, 2016.

Defendants Awuko and Wandmacher filed a motion to dismiss on June 28, 2016. (Dkt. No. 11). In its August 17, 2016 Order (Dkt. No. 17), this Court held that Plaintiff's claims against Defendants were barred by the relevant statutes of limitations. Plaintiff subsequently filed this motion for reconsideration pursuant to Rule 59(e) of the Federal Rules of Civil Procedure. (Dkt. No. 24).

### Legal Standard

▮▮▮ Federal Rule of Civil Procedure 59(e) governs motions to alter or amend a judgment, but the rule does not provide a standard courts may use to grant such motions. The Fourth Circuit has articulated "three grounds for amending an earlier judgment: (1) to accommodate an intervening change in controlling law; (2) to account for new evidence not available at trial; or (3) to correct a clear error of law or prevent manifest injustice." *Pac. Ins. Co. v. Am. Nat'l Fire Ins. Co.*, 148 F.3d 396, 403 (4th Cir. 1998) (citing *EEOC v. Lockheed Martin Corp.*, 116 F.3d 110, 112 (4th Cir. 1997); *Hutchinson v. Staton*, 994 F.2d 1076, 1081 (4th Cir. 1993)). "Rule 59(e) motions may not be used, however, to raise arguments which could have been raised prior to the issuance of the judgment, nor may they be used to argue a case under a novel legal theory that the

party had the ability to address in the first instance." *Pac. Ins. Co.*, 148 F.3d at 403 (internal citations omitted). Rule 59(e) provides an "extraordinary remedy that should be used sparingly." *Id.* (internal citation omitted).

### Discussion

Plaintiff's arguments can be grouped under three distinct headings, each of which suggests that the Court made a clear error of law or that some manifest injustice must be corrected. The Court addresses these arguments below.

**First Argument:** *The Court improperly considered supporting documents attached to Defendants' Reply, and the Court should either (a) disregard those documents, or (b) allow Plaintiff to "respond to the new matter inappropriately included in [Defendants'] Reply." (Dkt. No. 24 at 2).*

Plaintiff first argues that Local Civil Rules 7.04 [1] and 7.07 bar the Court from considering the documents Defendants attached to their reply to Plaintiff's response to Defendants' motion to dismiss. Local Civil Rule 7.04 provides, in pertinent part, "motions shall be accompanied by affidavits or other supporting material." Citing no authorities, Plaintiff proclaims "This means all affidavits and supporting documents" must be attached to the initial motion. (Dkt. No. 24 at 2). This is not the law.

▮▮▮ Although this Court discourages replies, they occasionally serve a useful function. *See* Local Rule 7.07 (limiting the scope of a reply to "matters raised initially in [the] response to [the] motion."). The Local Rules are silent regarding whether a supporting document can be attached to a reply, but it is standard practice in this

---

1. Plaintiff's motion cites Local Rule 7.03, but quotes Local Rule 7.04. Local Rule 7.03 pertains to the Court's expectation that counsel will "file motions immediately after the issues raised … are ripe for adjudication."

Court—and most courts—for parties to attach supporting documents to their filings. To the extent a reply is responsive to issues first raised in a response, any supporting documents attached to that reply are properly before the Court. *Accord McGinnis v. Se. Anesthesia Associates, P.A.*, 161 F.R.D. 41, 42 (W.D.N.C. 1995) (holding that striking reply affidavits would be contrary to the letter and spirit of Fed. R. Civ. P. 6(b)).

The Court now turns to the question of whether Defendants' reply was responsive to issues first raised in Plaintiff's response to Defendants' motion to dismiss. Defendants' motion to dismiss argued, in relevant part, that (1) Plaintiff's suspicions regarding their payments to Korte was sufficient to trigger the discovery rule as early as April 2012, and (2) Plaintiff had actual knowledge of facts giving rise to potential claims against them (*i.e.*, their payments to Korte) by October 3, 2013 at the absolute latest, as evinced by a letter from Plaintiff's president to Defendants (Dkt. No. 11–1 at 4–6).

In response, Plaintiff (1) denied that the October 3, 2012 letter represented actual knowledge (Dkt. No. 15–1 at 2 ("When [Plaintiff's president] wrote [the] letter of October 3, 2012 ... [he] was really taking a shot in the dark about the allegation of payments .... [He] had no evidence of such payment ....")); and (2) asserted that "Defendants successfully hid their payments to [Korte] from [Plaintiff] until February 4, 2013" (Dkt. No. 15 at 6).

██ Plaintiff raised the assertion that it had no knowledge of the payments until

February 4, 2013, for the first time in its response.[2] Defendants' reply directly countered this assertion with supporting documents predating February 4, 2013. (Dkt. Nos. 16–2 at 2 (Nov. 14, 2012 letter from Plaintiff's former counsel stating that "[Plaintiff] advises me that it is not that it is not disputed that, unknown to [Plaintiff], your company paid [Korte] substantial sums of money"); 16–3 at 3 (January 25, 2013 letter from Plaintiff's former counsel stating he "was quite surprised to learn that [Defendants] explicitly admitted in writing having made substantial payments to [Korte]"); 16–4 at 1 (January 29, 2013 email responding to the January 25, 2013 letter discussing payments to Korte).[3] Because Defendants' reply was responsive to an issue first raised in Plaintiff's response, the reply and the associated supporting documents were properly before the Court.

Furthermore, Plaintiff has failed to establish how the Court's consideration of these three documents to and from its former attorneys resulted in manifest injustice. Plaintiff had ample opportunity to respond to these documents, and indeed did so through the affidavits of its president and former German counsel. (Dkt. Nos. 24–1, 24–2).

**Second Argument:** *The statute of limitations did not begin to run until February 4, 2013 because (a) the discovery rule was never triggered, or (b) Defendants concealed their actions. (Dkt. No. 24 passim).*

Plaintiff next argues that the Court erred in holding that the statute of limita-

---

**2.** Although a similar date appears in the complaint three times, it is not connected to any assertion that Plaintiff lacked actual knowledge of the payments before that date. (*See* Dkt. No. 1–1 at ¶ 14 (alleging that Defendants were paying bribes before February 2, 2013); ¶ 15 (alleging that Korte was accepting bribes before February 2, 2013), and ¶ 58 (alleging

that on or around February 2, 2013, Defendants' German counsel admitted that Defendants paid Korte).

**3.** Defendants attached an additional affidavit, but the Court did not cite it in its order granting Defendants' motion. (*See* Dkt. No. 17).

tions began to run before February 4, 2013 because, until that date, (1) "Plaintiff had suspicions, but no factual basis to assert in a court of law that the Defendants engaged in the tortious conduct ... described in the Complaint," and (2) "Plaintiff had no knowledge of any damages sustained by Plaintiff due to the Defendants' said tortious conduct." (Dkt. No. 24 at 3). Even if these statements are true, they do not alter the Court's analysis of whether the statute of limitations expired before Plaintiff filed this action.

■ Despite Plaintiff's arguments to the contrary, factual certainty and actual knowledge are not the only factors that cause statutes of limitations to run. If this were the case, statutes of limitations would begin to run only when a potential plaintiff actually knows all of the information necessary to prove a claim or a potential defendant admits liability. If this were the law, statutes of limitations would be completely ineffectual in carrying out their "ultimate purpose": promoting prompt litigation and preventing stale claims from reaching the Court without a showing of good cause. *Delebreau v. Bayview Loan Servicing, LLC*, 680 F.3d 412, 415 (4th Cir. 2012).

■ As the Court previously explained, under "the discovery rule, the statute of limitations begins to run from the date the injured party either knows *or should know*, by the exercise of reasonable diligence, that a cause of action exists for the wrongful conduct." *True v. Monteith*, 327 S.C. 116, 489 S.E.2d 615, 616 (1997) (emphasis added). The "exercise of reasonable diligence" requires that the injured party "act with some promptness where the facts and circumstances of an injury place a reasonable person of common

knowledge and experience on *notice* that a claim against another party might exist." *Dean v. Ruscon Corp.*, 321 S.C. 360, 468 S.E.2d 645, 647 (1996). The date on which the discovery of a cause of action should have been made is an objective question, *Bayle v. S. Carolina Dep't of Transp.*, 344 S.C. 115, 542 S.E.2d 736, 740 (S.C. Ct. App. 2001), and to the extent that there is no conflicting evidence regarding whether a claimant should have known that a cause of action existed, resolution of the question is appropriate at summary judgment. *See Moriarty v. Garden Sanctuary Church of God*, 341 S.C. 320, 534 S.E.2d 672, 681 (2000).

For the purposes of this motion, the following facts and circumstances are uncontroverted [4]:

(1) When Plaintiff and Defendants entered into business agreements in April 2011, Plaintiff's president "specifically and unequivocally forbade Defendants from paying any money directly to Korte ... because [he] wanted [Korte's] undivided loyalty." (Dkt. No. 15–1 at 1).

(2) After Korte stopped working for Plaintiff in March 2012, Plaintiff's president had sufficient suspicion that Korte was "disloyal to [Plaintiff]" by "providing information to other competitors and vendors" to confront him. (Dkt. No. 15–1 at 1–2). Specifically, Plaintiff was concerned that "Korte retained custody of [one of Plaintiff's] laptop computer[s,] which contained years['] worth of marketing intelligence and [t]rade [s]ecrets, even after [Korte] had ... gone to work for a competitor." (Dkt. No. 24–1 at 1). "Korte denied any wrongdoing." (Dkt. No. 15–1).

---

4. These facts are found in the affidavits of Plaintiff's president (Dkt. Nos. 15–1, 24–1) or directly asserted in Plaintiff's motion for reconsideration (Dkt. No. 24).

(3) A July 2012 meeting in which one of Defendants' salesmen referenced Defendants' "investment" in Korte prompted Plaintiff's president to contact Defendants' president regarding his suspicions that Defendants were paying Korte. (Dkt. No. 15–1 at 2). Defendants' president allegedly denied that any such payments occurred. (*Id.*)

(4) In October 2012, Plaintiff's president "t[ook] a shot in the dark about the allegation of payments" and again "contacted Defendants' president regarding payments to Korte." (*Id.*). At this time, Defendants' president allegedly denied that Defendants payed Korte, instead stating that Defendants "had covered some 'hoped for' marketing expenses ... so Korte could attend a trade show." (*Id.*).

(5) At some point before November 14, 2012, Defendants acknowledged "the fact of the payments" (Dkt. No. 24–1 at 3), and by January 25, 2013, Plaintiff's counsel contacted Defendants to "request[ ] an explanation as to the purpose of the payments." (*Id.* at 4).

(6) On or around December 18, 2012, Plaintiff discovered that Defendants had attempted to initiate a declaratory action against it in Germany. (Dkt. No. 24 at 6). In the complaint for that action, Defendant plainly asserted the contract lacked "any instruction not to make any payments to [Korte]," and, absent such a provision, "there is no evidence of breach of contract." (Dkt. No. 11–8 at 6).

In sum, by the end of December 2012, Plaintiff knew, at a minimum, that (1) Korte had retained Plaintiff's laptop and the sensitive information it contained after he stopped working for Plaintiff and began working for a competitor; (2) Defendants had directly paid Korte while he worked for Plaintiff, despite the fact that Plaintiff unequivocally forbade Defendants from engaging in such conduct due to concerns regarding Korte's loyalty; (3) Defendants repeatedly denied that they made any direct payments to Korte before acknowledging "the fact of the payments;" and (4) Defendants had attempted to initiate a declaratory action against Plaintiff regarding the contractual propriety of their payments to Korte.

Even if Plaintiff lacked *actual* knowledge that a cause or causes of action relating to Defendants' payments to Korte existed, the uncontroverted facts and circumstances—which *Plaintiff* provided the Court—are objectively sufficient to "place a reasonable person of common knowledge and experience on *notice* that a claim against another party might exist," *Dean v. Ruscon Corp.*, 321 S.C. 360, 468 S.E.2d 645, 647 (1996). Plaintiff had actual knowledge that (1) Defendants paid Korte and (2) Korte allegedly retained Plaintiff's physical and intellectual property, and that actual knowledge provides notice of possible injury. Plaintiff's sworn knowledge of Defendants' repeated lies regarding payments to Korte provides common-sense notice to any reasonable, objective person that Defendants and Korte may have possessed suspect motives. Furthermore, even though Plaintiff contests whether the German complaint was validly served (Dkt. No. 24 at 6 n.2), an invalidly served but actually received complaint conveyed the adversarial nature of the relationship between Plaintiff and Defendants just as clearly as a validly served complaint would have. Because such uncontroverted facts existed, reasonable diligence required Plaintiff to "act with some promptness" in ascertaining the viability

of and pursuing its claims. *Dean*, 468 S.E.2d at 647.

The Court next turns to Plaintiff's argument that the statute of limitations should not have run because Defendants "purposefully conceal[ed] the bribery" by failing to admit liability. (Dkt. No. 27 at 7).[5] If our legal system required defendants to admit liability before starting the clock on statutes of limitations, a defendant's failure to admit every allegation contained in a demand letter or voluntarily provide unrequested-but-relevant information would result in perpetual exposure to liability. This is not the law. *See Delebreau v. Bayview Loan Servicing, LLC*, 680 F.3d 412, 415 (4th Cir. 2012) (identifying the "general legislative purposes" of statutes of limitation as "encouraging prompt initiation of claims and . . . avoiding the inconvenience and fraud that may result from the assertion of stale claims").

Finally, to the extent Plaintiff's motion to reconsider attempts to resuscitate its equitable tolling arguments, the Court finds the arguments unpersuasive. The Court reaffirms its holding that the statute of limitations ran on Plaintiff's claims against Defendants before they filed this action on February 1, 2016. (*See* Dkt. No. 17 at 5).

**Third Argument:** *The question of whether the statute of limitations began to run is a question for the jury rather than the Court. (Dkt. No. 24 at 16–17).*

■ Plaintiff argues that the question of whether the statute of limitations began to run due to what Plaintiff should have known is a question for the jury to resolve. To the extent that there is no conflicting evidence regarding whether a claimant

should have known that a cause of action existed, however, resolution of the question is appropriate at summary judgment. *See Moriarty v. Garden Sanctuary Church of God*, 341 S.C. 320, 534 S.E.2d 672, 681 (2000).

As discussed above, uncontroverted evidence leads to the conclusion that a reasonable person in Plaintiff's shoes should have been on notice that a claim or claims against Defendants might exist by no later than January 2013. Accordingly, Plaintiff's argument is unfounded.

### Conclusion

Plaintiff has failed to identify an intervening change in controlling law, new evidence, clear error, or manifest injustice that would support its motion for reconsideration. For the abovementioned reasons, the Court **DENIES** Plaintiff's Rule 59(e) motion. (Dkt. No. 24).

**AND IT IS SO ORDERED.**

---

**5.** Plaintiff makes several variations of this argument. (*See, e.g.*, Dkt. No. 24 at 5 (Defendants and Korte denied any financial relationship); 6 (Defendants mischaracterized the payments to Korte as reimbursements on October 18, 2012); 6–7 (Defendants "misrepresented" their actions by asserting, in the German declaratory judgment action, that there was no breach of contract); 7 (Defendants admitted that they paid Korte, but failed to reveal "the substance of Defendants' *quid pro quo* relationship")).